**UNITED STATES DISTRICT COURT**

**EASTERN DISTRICT OF LOUISIANA**

| | | |
|---|---|---|
| **GRAND ISLE SHIPYARDS, INC.** | * | **CA No. 15-129 c/w 15-152, 15-153, 15-905** |
| | * | **19-11825, 19-11826, and 19-11827** |
| | * | **(Applies to All Cases)** |
| | * | |
| **VERSUS** | * | **JUDGE WENDY B. VITTER** |
| | * | **SECTION "D"** |
| | * | |
| **BLACK ELK ENERGY OFFSHORE** | * | **MAGISTRATE JUDGE MICHAEL B.** |
| **OPERATIONS, LLC** | * | **NORTH (5)** |

\* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \*

**GRAND ISLE SHIPYARDS, INC.'S MEMORANDUM IN SUPPORT OF ITS
MOTION TO MODIFY ORDER TO CERTIFY
FOR APPEAL PURSUANT TO 28 U.S.C.
SECTION 1292(b) AND TO STAY PENDING INTERLOCUTORY APPEAL**

Grand Isle Shipyards, Inc. (hereinafter, "GIS"), submits this memorandum in support of its

Motion to Modify the Court's Order [Rec. 329] (the "Order") granting Partial Summary Judgment

to the Trustee of the Black Elk Energy Operating Liquidation Trust, and interpreting the provision

of La. Civ. Code Art. 2003, which reduces the recoverable damages for breach of contract by an

obligee in proportion to the negligence of the obligee, as requiring a showing of an "antecedent"

breach of contract by the obligee.   GIS seeks modification of this prior Order, through Fed. R. Civ.

Pro. Rule 52(b) and/or Rule 59(e), in order to certify the Order for interlocutory appeal pursuant to

28 U.S.C. § 1292(b), and seeks to stay the suit pending interlocutory appeal.

## I.  INTRODUCTION

Immediate appellate review under 28 U.S.C. § 1292(b) serves the important function  of preserving judicial and party resources through the definitive determination of interlocutory decisions that directly affect the direction that the litigation will take.

GIS submits that this function will be served through the § 1292(b) certification of the  Court's February 12, 2021 Order granting the Motion for Partial Summary Judgment (the "Order") [Rec. 329]. While the Order is not dispositive of the entire case, it is critical to the case as a whole because it may effectively remove from the Court's consideration in assessing damages, numerous acts and omissions made by employees (both direct and indirect) of Black Elk Energy Offshore Operating Company ("BEEOO") prior to the explosion on West Delta 32 even though these numerous acts and omissions all combined serially to produce the explosion and caused the damages BEEOO has claimed it sustained.  A simple pro rata reduction of the $17,935,307.40 in damages which are being claimed, when calculated based simply on the number of negligent acts/omissions of BEEOO (through both its direct and indirect employees) compared to negligent acts/omissions of GIS which are claimed to also constitute breaches of contract, would produce a reduction of recoverable damages by substantially more than fifty percent. This is a direct result of BEEOO's negligence claims now being cast as a breach of contract case, after BEEOO's negligence claims were allowed to prescribe.  If allowed to stand, the Order produces possibly a manifest injustice and makes the amount of the damages claimed three-fold what it should be.

The Court's Order interprets the second part of La. Civ. Code Art. 2003, which reduces damages recoverable by an obligee where "the obligee's negligence contributes to the obligor's failure to perform . . . "  La. Civ. Code Art. 2003.  The reduction of damages is  "in proportion to that negligence."  La. Civ. Code Art. 2003.   The Order reads an additional requirement of an

"antecedent" breach of contract by the obligee, in addition to the negligent act(s) which prevent performance by the obligor, and thereby expands the judicial gloss that was developed in relation to La. Civ. Code Art. 2003 in *Lamar Constr. Inc. v. Kacco, Inc.,* 189 So.3d 394 (La. 2016), which interpreted facts nothing like those before the Court now.

The facts at issue in *Lamar Constr. Inc. v. Kacco, Inc.,* 189 So.3d 394 (La. 2016), involved claims of negligent non-payment by the obligee which were independent of the acts shown in *Lamar* to be the breach of contract. In *Lamar,* the breach of contract was not a series of negligent acts, it was a simple failure to provide what the parties had agreed upon. Here, the obligee (BEEOO) committed negligent acts which directly caused GIS' construction crew's actions, which BEEOO contends were a breach of contract. These facts fit squarely within the plain language of Louisiana Civil Code Article 2003 which reduces the obligee's damages in proportion to the obligee's negligence "which contributes to the obligor's failure to perform."   The phrase "contributes to the obligor's failure to perform" covers acts and omissions which occur either *prior to* or *concurrently with* the act of the obligor which is shown to be a "failure to perform." BEEOO takes the position GIS' negligence is a "failure to perform." GIS takes the position BEEOO's own negligence caused GIS' "failure to perform."   If GIS' negligence is a breach of the contract between the parties because hot work policies and procedures were not followed, then the same rule will apply to BEEOO's negligence and it will likewise be a breach of contract.

Louisiana Civil Code Article 2003 contains two separate paragraphs and two separate limitations on damages. The first paragraph of La. Civ. Code Art. 2003 is a "bad faith" provision, which completely bars an obligee from recovering any damages, where the obligee's bad faith has been shown. This paragraph uses familiar breach of contract language from Civil Code Article 1983, which requires good faith in the performance of contracts. *Lamar* refers to Article 1983 as

3

the "general duty" implied in all contracts: "This obligation is correlative to the general duty imposed by La. Civ. Code art. 1983, which requires '[c]ontracts must be performed in good faith.'" *Lamar*, 189 So.3d at 397. [1]

The second paragraph of La. Civ. Code Art. 2003, is a "negligence" provision, which provides "damages are reduced in proportion to [the obligee's] negligence." The two paragraphs express two entirely independent concepts and also produce entirely different results: one precludes damages, while the other reduces damages. In order for the second paragraph of Article 2003 to apply, the negligent action(s) of the obligee (BEEOO) must, by the express terms of Article 2003, contribute to "the obligor's failure to perform" the contract. La. Civ. Code Art. 2003. The second paragraph of Article 2003 plainly adopts a negligence standard by reducing damages for acts which "contribute[] to the obligor's failure to perform."

*Lamar* held that the negligence which produces a reduction in damages must also be a breach of a contractual duty between the parties, but it did not superimpose a new rule upon the plain language of Article 2003 so as to require some separate, independent breach of contract which occurs prior to the negligent act. In fact, the phrase "antecedent breach" never appears in *Lamar*. Instead, the Supreme Court states its "sole focus is on whether Lamar's actions during that relevant time frame contributed to that breach." *Lamar,* 189 So.3d at 397. The ruling of *Lamar* was simply this: "Taken as a whole, these authorities support the proposition that an obligor cannot establish an obligee has contributed to the obligor's failure to perform unless the obligor can prove the obligee itself failed to perform duties owed under the contract." There is nothing in *Lamar* to support the proposition that the obligee's failure to perform duties owed under the contract cannot

---

[1] *See also Whitney Bank v. SMI Cos. Global*, 949 F.3d 196, 200  (5th Cir. 2020) (" 'As a general rule, Louisiana recognizes an implied covenant of good faith and fair dealing in every contract.' *Clark v. Am.'s Favorite Chicken Co.*, 110 F.3d 295, 297 (5th Cir. 1997)").

occur concurrently with the failure of the obligor to perform. In fact, such a holding would squarely contradict the plain language of Article 2003 which expressly covers concurrent causes of nonperformance through its language "[i]f the obligee's negligence contributes to the obligor's failure to perform." La. Civ. Code. Art. 2003.

Louisiana case law is considered a secondary source of law, while the Louisiana Civil Code is the primary source of Louisiana civil law. *Apache Deepwater, LLC v. WT Offshore, Inc*., 930 F.3d 647, 654 (5th Cir.) *writ den.* 140 S.Ct. 649, 205 L.Ed. 2d 391 (2019) ("Even case law rising to the level of *jurisprudence constante* is secondary law in Louisiana") *See also*, *In Re Katrina Canal Breaches,* 495 F.3d 191, 206 (5th Cir. 2007) ("In making an *Erie* guess, we must employ Louisiana's civilian methodology, whereby we first examine primary sources of law: The constitution, codes, and statutes.") Therefore, the Fifth Circuit could readily determine that Civil Code Article 2003 provides the clear answer for this case by the plain language of its own text, *i.e.*: "If the obligee's negligence contributes to the obligor's failure to perform, the damages are reduced in proportion to that negligence."  La. Civ. Code Art. 2003. Clearly, for the obligee's negligence to contribute to the obligor's failure to perform, the negligence must occur prior to or concurrent with the obligor's failed performance. GIS has put uncontroverted facts into the record which show that very scenario has occurred in this case. Further, if GIS' negligence is a breach of the contract between the parties because hot work policies and procedures were not followed, then the same rule will apply to BEEOO's negligence and it will likewise be a breach of contract.

Resolution of this issue on an interlocutory basis will provide the parties with the certainty that is necessary to avoid a re-trial of this case in the event the Fifth Circuit Court of Appeals ultimately concludes there should be no expansion of *Lamar* to require an additional "antecedent breach" prerequisite beyond the actual holding in *Lamar*, which was as follows:  "Lamar did not

violate any obligation to make payment to Kacco and could not have negligently contributed to

Lamar's breach of its obligations under the contract." *Lamar*, 189 So.3d at 399.

## II.   LAW AND ARGUMENT

**A.     The Three Requirements for § 1292 (b) Certification Are Met In this Case.**

"Appeals are frequently certified [under § 1292(b)] from orders, particularly those granting

summary judgment – that establish some or all issues of liability, leaving other matters open for

further proceedings." *Wright, et al.*, 16 FED. PRAC. & PROC. § 3931, p. 467 (2d ed. 1996). *See*,

*Conner v. Lavaca Hosp. Dist.*, 2001 U.S. App. LEXIS 21112 (5th Cir. 9/28/01); *Makedwde*

*Publishing Co. v. Johnson*, 37 F.3d 180, 181 (5th Cir. 1994).

Section 1292(b) explicitly authorizes certification of an interlocutory order for immediate

appeal when the following three criteria are present: (1) the order from which the appeal is

taken involves a controlling question of law; (2) there is substantial ground for difference of

opinion as to that question; and (3) an immediate appeal from the order may materially advance

the ultimate termination of the litigation. *See* 28 § 1292(b); *LaFargue v. United States*, 4 F.

Supp.2d 580, 593 (E.D. La. 1998). The order of the three criteria tracks the language of the statute,

but there is no single one of the three criteria that has been determined by the federal courts to take

precedence or be given any more weight than the others.

Federal cases interpreting the statute have held that the § 1292(b) criteria are not to be

interpreted rigidly, but instead are to be "applied to allow appeals in light of the purposes of

avoiding harm to litigants *or* avoiding the wastes of unnecessary or repeated protracted

proceedings." *Wright, et al.*, 16 Fed. PRAC. & PROC. § 3929, p. 369 (2d ed. 1996) (emphasis in

original). The Fifth Circuit takes this "desirably flexible approach to § 1292(b)."[2] *See Hadjipateras v. Pacifica, S.A.*, 290 F.2d 697, 703 (5th Cir. 1961). F u r t h e r ,  the "requirement that an appeal may materially advance the ultimate termination of the litigation is closely tied to the requirement that the order involve a controlling question of law." *Wright, et al.*, 16 FED. PRAC. & PROC. § 3930, p. 427.  With these statutory precepts and goals in mind, the three § 1292(b) criteria clearly are present in this case.

1.      **The Order which GIS seeks to appeal involves a controlling question of law regarding which an immediate appeal may materially advance the ultimate termination of the litigation.**

A "court should grant an interlocutory appeal if a denial would result in wasted litigation and expense." *In re Efficient Solutions, Inc.*, 2000 U.S. Dist. LEXIS 15207 (E.D. La.2000) at *2. Accordingly, the "key consideration" when determining whether a controlling question of law exists "is whether [the order] truly implicates the policies favoring interlocutory appeal . . . [which] have included the . . . avoidance of possibly wasted trial time and litigation expense." *Katz v. Carte Blanche Corp.*, 496 F.2d 747, 756 (3d Cir.), *cert. denied,* 419 U.S. 885 (1974).

A "question is controlling, even though its disposition might not lead to a reversal on appeal, if interlocutory reversal might save time for the district court and time and expense for the litigants." *Wright, et al.*, 16 FED. PRAC. & PROC. § 3930, p. 426 (2d ed. 1996). Moreover, a "question of law may be deemed 'controlling' if its resolution is quite likely to affect the further course of the litigation, even if not certain to do so." *Sokaogon Gaming Enterprise Corp. v. Tushie Montgomery Assoc.*, 86 F.3d 656, 658-59 (7th Cir. 1996). This approach "best fulfills the goal

---

[2] *Wright, et al,* 16 FED. PRAC. & PROC. § 3931, p. 467 (2d ed. 1996).

of enabling occasional adjustment of general final judgment appeal rules to meet the particular needs of particular cases." *Wright, et al.*, 16 FED. PRAC. & PROC. § 3930, pp. 426-27.

This overriding need to focus on saving time and resources "underscores the artificiality of attempting to identify a controlling question as an inquiry separate from the prediction whether appeal may materially advance the ultimate termination of the litigation." *Id.* at 427. In other words, the "requirement that an appeal may materially advance the ultimate termination of the litigation is closely tied to the requirement that the order involve a controlling question of law." *Id.* at 432. It is appropriate, therefore, that, these two § 1292(b) factors be analyzed together.

In *Asarco, LLC v. Mont. Res. Inc.,* 2016 U.S. Dist. LEXIS (S.D. Tex. 2016) the Court was faced with the prospect of a long, expensive trial in a breach of contract case that involved controlling issues of state law, and thus found those issues of state law warranted interlocutory appeal:

> The trial of this matter will be expensive for all parties and difficult to present . . . [and] may take weeks to try. The facts in this matter reach back decades and involve parties that have lost employees through both attrition and bankruptcy. An appeal at this stage could immediately terminate this case. A different ruling on any of the first three issues delineate above could result in a summary victory for the defendants and terminate a costly legal battle that has yet been fought. It could save substantial time and money for the parties and will result in judicial efficiency. *A reversal or affirmance on the last issue would almost certainly lead to serious negotiations between the parties that would in all likelihood lead to a termination of this matter.*

*Asarco, supra* at *9-10 (emphasis added). *Asarco* involved state law issues determined by summary judgment, which is like many of the cases where interlocutory review has been found appropriate.

For instance, *First Am. Bank v. First Am. Transp. Title Ins. Co.*, 585 F.3d 833 (5th Cir. 2009) involved interpretation of the Louisiana Civil Code involving contract issues by way of summary judgment, which were certified for interlocutory appeal under § 1292(b); *R.J. Reynolds Tobacco Co. v. Hudson*, 314 F.2d 776 (5th Cir. 1963) likewise involved interpretation of the Louisiana Civil

Code by summary judgment, which was certified for appeal under § 1292(b); *Scott v. Ruston La. Hosp. Co.,* 2017 U.S. Dist. LEXIS 56138 (W.D. La. 2017) involved application of a Louisiana statutory law on recoverability of damages which was decided on summary judgment and certified for interlocutory appeal under § 1292(b);  *McMillan v. Amazon*,  983 F.3d 184 (5th Cir. 2020) involved interpretation of Texas state statutory issues adjudicated on summary judgment which were certified for appeal under § 1292(b);  *Faulk v. Union Pac. R.R. Co.* (5th Cir. 2011) likewise involved an interlocutory appeal under § 1292(b) of an order adjudicating state law statutory issues on summary judgment;  *Dore Energy Corp.v. Prospective Trading Co.,* 2008 U.S. Dist. LEXIS 1020 (W.D. La. 2008), involved cross-motions for summary judgment and state law contract issues, which were certified for interlocutory appeal under § 1292(b); *Williamson v. Elf Acquitaine*, 1996 U.S. Dist. LEXIS 21473 (N.D. Miss. 1996) likewise involved summary judgment granted on issues of state property law which were certified for interlocutory appeal under § 1292(b).

The question resolved by the Order – whether GIS can seek a reduction in damages in proportion to the negligence of BEEOO under Louisiana Civil Code Article 2003 -- is a central issue of this case because the series of acts and omissions which occurred over the course of a relatively short period of time are conceptually inseparable in terms of whether one was what the Court has termed an "antecedent breach" in relation to the others, because they all combined to produce the explosion on West Delta 32.  For instance:  (1)   BEEOO employee Monte Richard decided at the last minute to add the hot work involving the interconnected piping to a scope of work which had previously been assigned to GIS, and this was the piping that had not been made safe for hot work by BEEOO's person in charge of West Delta 32; (2) BEEOO's person in charge of West Delta 32 assigned his job of issuing hot work permits to an inexperienced subordinate who did not even

attend GIS' morning safety meetings, so he had no idea where GIS' crew was planning on working on any given day but issued hot work permits anyway; (3) the inexperienced subordinate was told by Srubar to copy the last hot work permit Srubar had issued several days before the date of the explosion and had been copying the same hot work permit for several days; (4) BEEOO's construction superintendent told GIS' crew supervisor at the beginning of the job that the work areas been purged and made safe for hot work, when all work areas where GIS was directed to perform work had actually not been made safe.  These are the uncontested facts that appear in the several Factual Basis statements of the people who were criminally prosecuted, including BEEOO itself,  whose Factual Basis statement was signed by the Trustee.[3]  *See Breeland v. Security Ins. Co.*, 421 F.2d 918, 923 (5th Cir. 1969); *Meadows v. Evans*, 550 F.2d 345, 350 (5th Cir. 1977) ("[N]ow it is generally accepted that a criminal conviction may be used by a party to a subsequent civil proceeding to estop the former defendant from relitigating issues that were necessarily resolved against him in the prior criminal case.").  *See also Parklane Hosiery Co. v. Shore*, 439 U.S. 322, 99 S. Ct. 645, 98 L. Ed. 2d 552 (1979) (regarding collateral estoppel).

An explosion on an offshore platform like that which occurred on November 16, 2012 is not a common occurrence. The explosion occurred because there were many failures of many different persons, some of whom have admitted their negligence in criminal proceedings.  However, the Order  produces the manifestly unjust result of foisting all the damages, which may be proved to have been sustained by BEEOO, entirely upon GIS. Such an unjust result is not what the plain language of Civil Code Article 2003 calls for or requires in this case. The Louisiana Supreme

---

[3] *See also* Rec. 171, Proposed Pre Trial Order, at pp. 6-7, Uncontested Fact Nos. 15, 16-17.

Court's decision in *Lamar*, 189 So.3d 394, likewise does not call for or require such an inequitable and unjust result, and interlocutory appeal of this issue could easily reduce the $17,935,307.40 in damages which are now claimed,  to much less than half that amount.

Thus, the Court's resolution of this question unquestionably will affect the further course of this litigation.  Moreover, immediate appellate consideration of the question will serve to advance the ultimate termination of the litigation by avoiding the potential for re-trying the case if the appeal of this issue is delayed until after the trial. Accordingly, an immediate appeal will preserve the resources of both the Court and the parties.

Even where, as here, an early appellate reversal might broaden the scope of the trial, immediate review of the controlling issues nonetheless may materially advance the ultimate termination of the litigation in the long run. For example, the court in *Alpex Computer Corp. v. Nintendo Co., Ltd., et al.*, 1991 U.S. Dist. LEXIS 17559 (S.D.N.Y. 1991) certified for its exclusion of certain evidence under § 1292(b), stating:

> The key phrase in this prong of the test for certification under § 1292(b) is 'ultimate termination of the litigation.'  In the short term, an immediate appeal of the court's previous orders will undoubtedly prolong a suit that has gone on far too long already. In the long run, however, an immediate appeal will likely shorten the ultimate conclusion of the litigation by allowing the Federal Circuit to rule on questions that, if later shown to be error, will likely require a new trial – in a case where the parties estimate that trial will last at least five weeks. The court thus holds that an immediate appeal of those questions arising out of the court's July 18 opinion will materially advance the termination of the litigation.

*Id.* at *5-6. In *Truehart v. Blandon*, 672 F. Supp. 929 (E.D. La. 1987), a court in this District issued a § 1292(b) certification of its denial of "loss-of-society" claims, because that claim constituted such a large portion of the desired recovery. The court held that because the "plaintiff's loss-of-society claim constitutes the vast portion of the compensatory damages sought, the Court

is of the further opinion that an immediate appeal may materially advance the ultimate termination of the litigation." *Id*. at 938. *Scott v. Ruston La. Hosp. Co.,* 2017 U.S. Dist. LEXIS 56138 (W.D. La. 2017) similarly involved an issue of recoverability of damages, and the court found interlocutory appeal particularly appropriate due to its potential impact on settlement: "The Court also finds that a decision on this issue may help to advance settlement, a factor that courts have found significant in permitting interlocutory appeals to proceed." *Id*. at \*15-16.

The issue on recoverable damages for which GIS seeks interlocutory review by this motion in this case is quite similar to the issue in *Truehart* and *Scott*, because the Order essentially will allow recovery of all the damages which BEEOO can show it sustained exclusively from GIS, even though GIS was only one of many actors whose acts/omissions produced the damages and even though BEEOO's own acts/omissions "contribute[d] to the obligor's failure to perform." La. Civ. Code Art. 2003. Thus this issue of recoverable damages is unquestionably controlling within the meaning and intent of 28 U.S.C. § 1292(b).

### 2. Substantial ground for difference of opinion exists.

A "substantial ground" may exist even when a district court strongly believes in the validity of its decision, such that it will not grant a rehearing: "Although in the Court's mind there does not exist the strong possibility that the Memorandum Ruling was incorrect, the Court recognizes that its ruling does involve a controlling question of law as to which there is a substantial ground for difference of opinion." *Brown v. Texas & Pac. R.R.*, 392 F. Supp. 1120, 1125 (W.D. La. 1975). Otherwise, there would never be interlocutory appeals.

Moreover, the "level of uncertainty required to find a substantial ground for difference of opinion should be adjusted to meet the importance of the question in the context of the specific

12

case." 16 *Wright, et al.*, Fed. PRAC. & PROC. § 3930, p. 422 (2d ed. 1996).  For example, in *Hahn v. City of Kenner*, 1998 U.S. Dist. LEXIS 5984, *12 (E.D. La. 4/21/98), the court certified that a difference of opinion existed as to the availability of fees under vague statutory language. The Court in *Hahn* determined that the "size and duration of this litigation, the number and visibility of the parties involved, and the legal complexity of some of the claims at issue" influenced the court's decision to certify.  *Id*. at *11.

There is substantial ground for difference of opinion as to question decided by the Order in this case because *Lamar,* 189 So.2d 394, interpreted the second paragraph of Article 2003 in a case where a separate independent breach of contract was alleged to have been "negligent non-payment."  The Louisiana Supreme Court interpreted Civil Code Article 2003, by focusing on the question of whether "Lamar's actions during the relevant time frame contributed to that breach for purposes of La. Civ. Code art. 2003."  *Lamar*, 189 So.3d at 397.  Lamar was the obligee. The focus, according to the Louisiana Supreme Court, was whether the obligee's "actions contributed to the breach."  Here, BEEOO claims to be the obligee who has been damaged by GIS' breach of contract. The focus therefore is whether BEEOO's "negligence contribute[d] to the failure to perform [*i.e*, the breach]."  La. Civ. Code Art.2003.

Here the Court has already ruled the contract for the services which GIS was performing on West Delta 32 was an oral contract. [*See* Rec. 318 at pp. 3-4 ("Specifically, the Court, in its previous Order, analyzed the evidence GIS presented and while finding an oral contract existed for the work GIS did on West Delta 32 . . . the Court explicitly found GIS did not meet its burden of proving an oral contract existed as to each of the more than $3,000,000 in invoices . . ."] [*See also* Rec. 194 at pp. 12-13]

There has been no written contract that has yet been ruled applicable to the GIS construction crew's services performed on West Delta 32 on November 16, 2012. There is a genuine dispute that any written contract governs this issue. The rule developed in *Lamar,* 189 So.3d 394, was where there was a clear written contract, therefore *Lamar* does not readily apply to this case where the alleged breaches of contract by both the obligor and the obligee, are really a series of negligent acts and there is an oral contract for services. Moreover, these negligent acts all occurred in a short period of time and, without any one of which, the explosion would not have occurred. *Lamar* does not instruct this Court how the Louisiana Supreme Court would apply Article 2003 in these circumstances. *Lamar* certainly does not compel the dismissal of GIS' FIFTH AFFIRMATIVE DEFENSE that asserts BEEOO "failed to mitigate, minimize or avoid the damages and losses alleged" nor does *Lamar* compel the dismissal of GIS' SEVENTH AFFIRMATIVE DEFENSE that asserts BEEOO's "alleged damages were caused or contributed to by [BEEOO's] own conduct, misconduct, negligence, omissions, actions, and/or reckless disregard of applicable policies, regulations and procedures." *See* Rec. 173 at p. 2. Surely, without any finding that a written contract even existed between GIS and BEEOO, and in light of the Court's ruling that an oral contract does exist, it would be premature to dismiss these defenses prior to trial, but that is the practical effect of the Order.

GIS opposed the Motion for Summary Judgment [Rec. 254] with uncontroverted evidence of numerous failures on the part of BEEOO which all occurred *prior to* the GIS crew undertaking to tack weld the interconnected pipe, which had not previously been rendered inert and which was in an area near the Wet Oil tank that had not been previously made safe by BEEOO:

> The facts show that BEEOO not only retained ultimate control over the work on West Delta 32 in this particular instance, but also that BEEOO specifically controlled the *unsafe* manner in which the LACT work was ordered by BEEOO to proceed with haste, when a prefabricated piece of interconnected pipe could not be

14

located. See Rec. 171, Uncontested Fact No. 16. It was at this point, BEEOO admits, its employee decided to order that the GIS crew weld the piece of pipe to the sump line in place of a pre-fabricated piece of pipe that could have been connected flange-to-flange, without any welding.[4] Unbeknownst to GIS, this sump line was not inert and was directly connected to the Wet Oil Tank, into which BEEOO had recently deposited an oil and water mixture from a "riser project."[5] For this reason, there is evidence of independent negligence and failure to disclose on BEEOO's part, by BEEOO having changed a scope of work from a flange-to-flange connection, which did not require any welding near the Wet Oil Tank, to a welded connection which explicitly required "hot work" – *i.e*, welding, to take place within 35 feet of the Wet Oil Tank. Rec. 171, Uncontested Fact Nos. 13 and 21. BEEOO specifically directed GIS to perform a dangerous scope of work.

*See* Rec. 273, GIS Opposition to Motion for Summary Judgment [Rec. 254], at p. 2-3.

GIS clearly argued that the failures of BEEOO to render the pipe inert and make the welding area where GIS was directed by BEEOO to perform welding, safe for the welding. GIS put uncontested facts in support of this argument in the record before the Order was issued. These facts were demonstrated through admitted facts in the Factual Basis pleadings of both BEEOO's person in charge, Chris Srubar,[6] and its construction superintendent, Don Moss.[7] Both men admitted to failures to perform obligations of BEEOO to make the area where it instructed GIS to work, safe for that work. These failures occurred prior in time to the alleged failures of GIS.

GIS' has also put into the record judicial admissions by BEEOO in its own Factual Basis, where BEEOO admitted that it failed, in numerous respects, to perform its duty to make the areas where the GIS crew was directed by BEEOO to weld, actually safe for GIS to weld, and the judicial admissions clearly demonstrate these failures occurred *prior to* the GIS crew having commenced their work on the morning of November 16, 2012. Therefore, comparing the acts of BEEOO to

---

[4] Rec. 171, Uncontested Fact No. 16.
[5] Rec. 273-5 (Deposition of BEEOO, Deposition Exhibit No. "4" attached Exhibit "4" (Inter-company email to John Hoffman from Doug Ferh: "there was oil and water put in the wet oil tank from the recent riser project.").
[6] Rec. 273-2.
[7] Rec. 273-1.

those of GIS in a purely temporal way, if such is the proper inquiry, the uncontested facts in the record quite clearly demonstrate the acts of BEEOO which produced the explosion preceded the acts of GIS.

This case amply demonstrates the inherent difficulties that arise when what is really a negligence case is being presented as a breach of contract case. It is because this case involves a series of negligent acts which combined to produce the damages BEEOO alleges, that the Louisiana Supreme Court's decision in *Lamar* is not dispositive of this case. There was nothing approaching concurrent negligence of the obligee shown by the obligor in *Lamar*.

The obligor in *Lamar* argued that negligent non-payment by the obligee had caused its inability to pay for materials and thus to perform. The Louisiana Supreme Court held there was no contractual duty to make the payments.  Here, GIS has demonstrated through uncontroverted facts that BEEOO's negligence put into motion the series of acts and omissions which occurred in *Palsgraf*-like fashion, to produce the damages which BEEOO seeks to recover in this case. If GIS' acts or omissions were breaches of the contract between BEEOO and GIS, because they failed to comply with the expectations of the parties to follow safe welding practices, then so too were BEEOO's acts and omissions breaches of the same contract and the very same expectations.

BEEOO's allegations are that the GIS construction crew failed to inspect the work area, failed to obtain a hot work permit, failed to take "necessary precautions" for the safety of the crew - - these are all essentially negligence claims.  Assuming for argument's sake these failures also constitute breaches of the oral contract between GIS and BEEOO, then BEEOO's similar such failures to inspect the work area, make the work area safe, and comply with BEEOO's hot work policies before issuing a hot work permit, were likewise breaches of contract - - and BEEOO's breaches have been shown through judicial admissions to have occurred before those of GIS.

16

BEEOO asserts it is entitled to $17,935,307.40 in damages because of the following facts:

"Curtis Dantin, violated the most fundamental provision of Black Elk's Hot Work Procedures when he failed to advise any of the platform operators or the construction inspector that his crew was going to perform hot work on a new area. In addition to Dantin's failure to advise the designated parties that his crew was about to begin hot work in a new area, the GIS crew failed to comply with other aspects of Black Elk's Hot Work Procedures including, but not limited to, failing to have a hot work permit for work in the LACT unit area, failing to inspect the work area with the platform supervisor prior to commencing hot work, failing to confirm that the work area had been isolated and made safe prior to commencing work, failing to establish a proper fire watch, and failing to use a functioning gas detector at the time hot work was performed."

[Rec. 251-1, BEEOO's Memorandum in Support at pp. 5-6.]

GIS disputes these acts constitute breaches of specific contract provisions, and GIS disputes there is anything other than the oral contract which the Court has already ruled applied to the services GIS was performing on West Delta 32. Assuming *arguendo* these facts do constitute breaches of specific contract provisions, then the negligent acts/omissions which BEEOO has itself judicially admitted, temporally preceded these breaches of contract by GIS. Even if *Lamar* is interpreted to require the negligence of the obligee to occur before and not concurrent with the nonperformance of the obligor – which is contradicted by the plain language of Article 2003 -- at the most rudimentary level, the negligence admitted by BEEOO occurred prior in time to the negligence admitted by GIS (*i.e.,* Dantin). Thus, to the extent GIS' negligence can also be characterized as breach of contract (which GIS disputes) BEEOO's negligence is also breach of contract, and these breaches of contract occurred prior to those of GIS. These serial acts and omissions are inextricably intertwined and BEEOO's acts contributed to, and in fact caused, those of GIS. If the parties' negligent acts are also breaches of contract, then a more clear case where

17

"the obligee's negligence contributes to the obligor's failure to perform" cannot be imagined than the facts of this case.

GIS' opposition to the motion for summary judgment on this issue argued that BEEOO's acts occurred *prior to* the alleged acts of GIS which BEEOO contends are contract breaches:

"Moss's Factual Basis in support of his plea deal plainly states:

'Moss admits that he was negligent in the manner in which he executed and performed his duties on the West Delta 32 platform.  Moss acknowledges that he failed to effectively communicate to Dantin and the construction crew at their morning safety meeting . . . that the sump line piping had not been rendered safe for hot work."  In Srubar's Factual Basis, Srubar admits he "was negligent in the manner that he conducted hot work he permitted on the platform, specifically, instructing the "C" operator to copy the previous day's hot work permit as a matter of routine . . . [and that] his negligence in the hot work permitting process contribut4d to events . . ."  Both Moss and Srubar were indirect employees of BEEOO: Scrubar served as BEEOO's Person-in-Charge of West Delta 32 and Moss served as BEEOO's Construction Supervisor.  This legal issue is raised in Contested Issues of Law in the Pre-Trial Order.'"

While Louisiana Supreme Court in *Lamar* developed a prerequisite for application of Article 2003 where the negligent act is alleged to be independent of the obligor's non-performance, in this case the negligent acts and omissions which GIS has proven through judicial admissions, were a concurrent chain of causation that produced the explosion on West Delta 32.  The *Lamar* case offers no *jurisprudence constante* on this issue of concurrent causation. However, Article 2003 provides the clear answer through the following language: "[i]f the obligee's negligence contributes to the obligor's failure to perform."  This can only mean the obligee's negligence can occur before *or* at the same time, so long as it "contributes" to the obligor's failure to perform.

*Lamar* did not express some new prerequisite for an antecedent breach, but instead simply applied the requirement that the negligence "contribute[] to the obligor's failure to perform" as stated in Article 2003. GIS does not concede that its negligence was also breach

18

of contract, but if GIS' negligence is breach of contract, then so too must be BEEOO's because they were parties to a services contract and BEEOO directed the services that GIS was instructed to provide.

The issue decided by the Order for which GIS seeks interlocutory appeal must be decided based on the plain language of Louisiana Civil Code Article 2003. Here, GIS has alleged and proven that the negligent acts and omissions of BEEOO have contributed to any "failure to perform" which BEEOO might make out of Curtis Dantin's negligence. Certainly, a substantial ground for difference of opinion exists in this case warranting an interlocutory appeal.

### III.   CONCLUSION

For the reasons stated above, GIS respectfully requests that the Court modify the February 12, 2021 Order [Doc. 329] to include a designation for immediate appeal pursuant to 28 U.S.C. § 1292(b). GIS submits a proposed order herewith. GIS further requests that the Court stay further proceedings in this action pending that appeal.

<div style="margin-left:45%">

Respectfully submitted,
**REICH, ALBUM & PLUNKETT, L.L.C.**

*/s/ Lawrence R. Plunkett, Jr.*
**LAWRENCE R. PLUNKETT, JR. (#19739)**
**MARVA JO WYATT (#18052)**
Two Lakeway, Suite 1000
3850 N. Causeway Blvd.
Metairie, Louisiana 70002
Telephone: (504) 830-3999
Facsimile: (504) 830-3950
Emails: lplunkett@rapllclaw.com
           mwyatt@rapllclaw.com
**Attorneys for Grand Isle Shipyards, Inc.**

</div>

19

**PHELPS DUNBAR LLP**

/s/ David M. Korn

David M. Korn (Bar #21676)
Ashley J. Heilprin (Bar #34928)
Canal Place | 365 Canal Street, Suite 2000
New Orleans, Louisiana 70130-6534
Telephone: 504-566-1311
Facsimile: 504-568-9130
Email: kornd@phelps.com
Email: ashley.heilprin@phelps.com
**Attorneys for Grand Isle Shipyard, Inc.**

**WAGNER, BAGOT & RAYER, LLP**

/s/ Thomas A. Rayer, Jr.

Thomas A. Rayer, Jr. (Bar #)
601 Poydras Street, Suite 1660
New Orleans, Louisiana 70130
Telephone: 504-525-2141
Facsimile: 504-523-1587
Email: trayer@wb-lalaw.com
**Attorneys for Grand Isle Shipyard, Inc.**

## CERTIFICATE OF SERVICE

**I HEREBY CERTIFY** that a copy of the above and foregoing has been served upon all counsel of record by hand delivery, electronic delivery, facsimile transmission, or by placing same in the U. S. Mail, postage prepaid, this 12th day of March 2021.

*/s/ Lawrence R. Plunkett, Jr.*

Lawrence R. Plunkett, Jr.

20